IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

WESLEY BROWN,                          )
                                       )
      Petitioner,                      )
                                       )
v.                                     )    Case No. 3:11-cv-00039
                                       )
JOHN "TONY" HOWERTON, Warden,          )    Judge Sharp
                                       )
      Respondent.                      )

## <u>MEMORANDUM OPINION</u>

Petitioner Wesley Brown was convicted and sentenced by the Criminal Court for Davidson County in Nashville, Tennessee after a jury trial in 2003. Now before the Court is his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. (ECF No. 1.) At the time the petition was filed, Brown was an inmate at the Southeastern Tennessee State Regional Correctional Facility in Pikeville, Bledsoe County, Tennessee. He has since given notice that he has been transferred to the Morgan County Correctional Complex in Wartburg, Tennessee.[1] This Court has jurisdiction. 28 U.S.C. § 2241(d).

## I.    BACKGROUND and PROCEDURAL HISTORY

On April 30, 2003, petitioner Wesley Brown was convicted on two counts of rape of a child and three counts of aggravated sexual battery by a jury in the Davidson County Criminal Court. On August 20, 2003, the petitioner was sentenced to 25 years in prison for each rape conviction, to be served consecutively, and 10 years for each sexual battery conviction, to be served concurrently with each other but consecutively to the rape sentences, for a total prison term of 60 years, without the possibility of parole. Petitioner was denied relief on direct appeal. *State v. Brown*, No. M2003-02804-CCA-R3-CD, 2005 WL 1412088 (Tenn. Ct. Crim. App. June 16, 2005). The Tennessee Supreme Court denied Brown's request for permission to appeal in December 2005. Brown then filed a petition for post-conviction relief in the state court on December 21, 2005. That petition resulted in a new sentencing hearing pursuant to *Blakely v. Washington*, 542 U.S. 296 (2004), and *State v. Gomez*, 239 S.W.3d 733

---

[1] The only proper respondent in a habeas case is the habeas petitioner's custodian, which in the case of an incarcerated habeas petitioner is the warden of the facility where the petitioner is incarcerated. Rule 2(a), Rules Gov'g § 2254 Cases. The Court therefore substitutes Warden John "Tony" Howerton in the caption.

(Tenn. 2007). In August 2008, Brown's sentence was reduced to 20 years on each of the rape convictions, to be served consecutively, and 8 years on the sexual battery convictions, again to be served concurrently with each other but consecutively to the rape sentences, for a total of 48 years, to be served at 100 percent. Otherwise his post-conviction claims were denied. The Tennessee Court of Appeals affirmed the denial of those claims. *Brown v. State*, No. M2008-0193–CCA–RD–PC, 2010 WL 2516857 (Tenn. Ct. Crim. App. June 22, 2010). The Tennessee Supreme Court denied permission to appeal on November 10, 2010.

Brown promptly submitted the instant petition for the writ of habeas corpus (ECF No. 1), which was filed on January 11, 2011. He asserts five separate "grounds" for relief, which the Court construes as setting forth thirteen separate claims, as follows:

(1) That the evidence was insufficient to support the petitioner's conviction, thereby violating the petitioner's constitutional rights under the Sixth and Fourteenth Amendments, because (a) the testimony of the alleged victim was not credible; (b) there was no physical evidence to support the rape convictions; and (c) the State failed to prove an essential element of the charge of aggravated sexual battery (Ground One);

(2) That the length of the prison sentence is excessive, in violation of the petitioner's constitutional rights, because the sentencing court rather than the jury applied enhancement factors (Grounds Two and Four);

(3) That the length of the petitioner's sentence is excessive because the trial court improperly imposed consecutive sentences rather than concurrent sentences (Grounds Two and Four);

(4) That the trial court's erroneous jury instructions violated the petitioner's right to a jury trial and to due process (Ground Five);

(5) That trial counsel was ineffective (Ground Three) for failing to conduct a reasonable investigation into the law and facts of the case, and specifically for failing to interview important defense witnesses and prepare defense witnesses for trial;

(6) That trial counsel was ineffective for advising the petitioner not to testify and for failing to prepare him to testify;

(7) That trial counsel was ineffective for failing to present any defense proof at trial;

(8) That trial counsel was ineffective for failing to investigate the complaining witness's mental health history or to issue subpoenas for psychiatric records;

(9) That trial counsel was ineffective for failing to investigate and object to the jury instructions regarding the *mens rea* for rape of a child;

(10) That trial counsel was ineffective for failing to recognize and object to discrepancies between the Bill of Particulars and the State's final election of offenses;

(11) That trial counsel was ineffective for failing to impeach witness Phyllis Thompson

regarding the technique employed in interviewing the complaining witness;

(12)  That trial counsel was ineffective for failing effectively to cross-examine nurse practitioner Sue Ross regarding her physical examination of the complaining witness; and

(13)  That trial counsel was ineffective for failing effectively to cross-examine the complaining witness's mother, Tracey Davidson.

(*See* ECF No. 1, at 5–24.)

Shortly after the petition was filed, the Court conducted a preliminary examination thereof and determined that it stated colorable claims for relief.  Accordingly, the Court entered an order (ECF No. 4) directing the respondent to answer, plead or otherwise respond to the petition.  Rule 4, Rules Gov'g § 2254 Cases.

The respondent submitted his Answer (ECF No. 17) and, after a series of discovery-related delays, the petitioner filed a reply brief (ECF No. 72).  Upon consideration of the petition, the answer, the reply, and the expanded record, the Court finds that an evidentiary hearing is not needed in this matter. *See Smith v. United States*, 348 F.3d 545, 550 (6th Cir. 2003) (an evidentiary hearing is not required when the record conclusively shows that the petitioner is not entitled to relief).  The petitioner's request for a hearing will therefore be denied, and the Court shall dispose of the petition as the law and justice require.  Rule 8(a), Rules Gov'g § 2254 Cases.

## II.      FINDINGS OF FACT

### A.      Evidence Presented at Trial

The facts underlying the petitioner's conviction were summarized by the Tennessee Court of Criminal Appeals as follows:[2]

> The defendant's stepdaughter, D.M.,[3] who was twelve years old at the time of the trial, testified that she had lived with her grandmother for the last eight years except for a period of about a year when she lived with her mother, Tracey Davidson Brown, and the defendant at their trailer.  She stated that her mother and the defendant had a son who was four years old at the time of the trial.  Additionally, the victim's grandfather, Jerry Davidson, lived with the defendant and the victim's mother at the trailer.

---

[2] State appellate court findings of fact can constitute factual findings in a habeas action. *See, e.g., Girts v. Yanai*, 501 F.3d 743, 749 (6th Cir. 2007); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

[3] Pursuant to policy, the Tennessee courts refer to juvenile victims of sexual offenses by their initials.

The victim testified to at least five distinct instances of sexual contact between herself and the defendant, which had occurred when she was in the fourth and fifth grades. The incident she remembered best occurred in the living room of the defendant's trailer. After Jerry Davidson left the living room, the defendant began touching her on the "inside" of her "front place" with his finger. His finger was "going around" her skin, which made her feel uncomfortable in her stomach. The incident lasted for a "few minutes." She illustrated the touching on an anatomically correct female doll, and for the record, the assistant district attorney stated, "[T]he witness has demonstrated a finger inserted between the labial lips" of the doll.

A second incident occurred in the living room at her grandmother's house when the defendant touched her on her "front private part and he was putting his finger in there and moving it around." The defendant put his hand inside her clothes. At the time, the victim was living with her mother and the defendant at their trailer, and they were visiting at her grandmother's house. She did not call out for others to come into the room because she was "scared."

The victim also recalled that the defendant touched her on the "front part of [her] privates" without putting his finger inside her. This occurred in the living room and the bedroom at the defendant's trailer. Asked what the defendant did with his hand on those occasions, the victim responded that he "move[d] it around."

On a separate occasion, the defendant had the victim touch his penis while they were in the bathroom. She demonstrated on an anatomically correct male doll, and with an ink pen, how the defendant had her touch him on his "front part . . . [o]n his skin" when his pants were "[o]pen and down." On the doll, the victim placed the palm of her hand on the penis, and on the ink pen, she encircled the pen with her finger and thumb. Touching the defendant felt "[y]ucky" on her hand; however, she did not do anything with her hand while touching him. She stated that this happened "towards the end" of the sequence of events involving sexual contact between her and the defendant.

The victim testified that the defendant showed her television programs showing "girls with their clothes off . . . having sex." "Probably about ten" times as they were watching the programs, the defendant touched her. "A couple" of times as they watched the programs, he did not touch her. Occasionally, the defendant's male friends would also be at the house watching these programs.

The victim stated she did not tell anyone about these incidents because she was "nervous and scared." When she was eleven years old, she told her grandmother about the defendant's activities because she was "feeling bad one night" and could not go to sleep. The victim did not tell her mother what was happening because she was "embarrassed." She said the defendant began touching her when she was five and six years old and that the incidents began after her brother was born.

On cross-examination, the victim testified she could not remember what year she lived with her mother and the defendant, only that it was "a couple of years ago." She said that the incidents with the defendant happened within the last three years and that she had not seen him in a year. She did not believe that she ever told the defendant "no," and he never told her why he was doing it nor asked her if he could. On redirect, the victim stated that some of the touching happened before her brother was born, but the incidents she remembered best occurred after he was born.

Phyllis Thompson, a licensed clinical social worker with Our Kids Center in Nashville, testified she interviewed the victim on May 15, 2001, in order to obtain her history for purposes of medical diagnosis and treatment. She said that the victim, who was ten

years old at the time, "went straight in and talked about concerns related to different kinds of touching." The victim did not demonstrate any difficulty in understanding the questions being asked, and she appeared to have "adequate cognitive and developmental abilities" for a ten-year-old. Utilizing anatomically correct drawings of unclothed children, the victim told Thompson that she was "concerned about her bottom," which she indicated on the drawings meant her genital area. The victim said the defendant had "touched that area with his hand on the skin and that it hurt." She said that the defendant "touched her butt one time, both inside and outside," and once had her touch his penis.

Sue Ross, a pediatric nurse practitioner at Our Kids Center, testified she examined the victim on May 15, 2001. While obtaining the victim's medical history from her grandmother, Ross discovered that the victim had been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"). Ross conducted a genital examination, during which the victim was cooperative but "very, very anxious." Ross did not observe any abnormal or unusual findings during the examination. On cross-examination, she stated that rarely would physical evidence of digital penetration be visible. Her examination revealed that the victim's anal and vaginal areas were "totally normal." On redirect, she stated that there could be digital penetration of the labia, moving "[b]ackwards, forwards, up, down," and still not be any sign of injury.

Tracey Dawn Davidson Brown, the victim's mother and the defendant's wife, testified she and the defendant had been married for almost five years but were separated at the time of trial. She and the defendant had a four-year-old son. The victim had lived with the victim's grandmother since she was four years old because Mrs. Brown had some "health issues." The victim stayed with the Browns "occasionally on weekends" and lived with them for about four months during the summer of 2000. Mrs. Brown never observed any inappropriate sexual behavior between the defendant and the victim and was never made aware of any such contact. She said that as they "would be flipping through [satellite television] channels . . . the [defendant] would stop at [an adult] channel and thought it was funny and would try and get [the victim's] attention long enough for her to glance at it." Mrs. Brown would "yell, tell [the defendant] to change the channel [and] tell [the victim] not to look at it." To try and get the victim to watch the program, the defendant "would say: 'Hey, [D.M.], look, look at the TV, look.'" She agreed that the incidents involving the defendant and the victim probably occurred between October 1999 and January 2001. There were times when the victim seemed afraid of the defendant.

Robert Samuel Barnes, an inmate at the Davidson County Jail, testified that the defendant, while in custody, admitted to Barnes that he had sexual relations with his stepdaughter, saying that she was ten years old at the time. Barnes said he volunteered this information to the police. He also admitted to having been convicted of burglary, criminal simulation, theft, and a bomb threat.

April Lynette Carson testified that she had been a friend of the victim's mother for about three years and had lived in the same neighborhood. She said she was present at the defendant's home when he exposed the victim to pornographic television programs several times. The defendant told the victim to look at what was on the television, and she and Mrs. Brown told him to turn it off, which he did. She stated that the defendant "talked mean" to the victim, and they "did not get along at all."

Laura Davidson, the victim's grandmother, testified that the victim had been living with her for nine years. In the summer of 2000, she let the victim move in with her mother to see if it would work out; however, it did not. The victim was diagnosed with ADHD when she was five and had received medication and treatment for it. In April 2001, Mrs. Davidson contacted the Department of Social Services after the victim told her that the defendant had been touching her "inappropriately," which the victim later

described as the defendant "putting his fingers in her vagina and her rectum." About a week before this disclosure, the victim was taken to the hospital, while spending the night with her mother and the defendant, because she was having an anxiety attack. Subsequently, the victim began getting "real anxious" at bedtime, and she finally disclosed the sexual abuse to her grandmother. The victim asked her grandmother to promise not to tell anyone because she thought that her mother would not love her if she found out.

Detective David Zoccola of the Metropolitan Nashville Police Department testified regarding his investigation of the victim's case. He had worked in the youth services division for about five years, and the victim's case was assigned to him after the initial report was made to the Department of Children's Services.

The defendant elected not to testify or present any proof.

*State v. Brown*, 2005 WL 1412088, at *1–*7 (one footnote omitted).

As stated above, on the basis of this evidence, the petitioner was found guilty on two counts of rape of a child and three counts of aggravated sexual battery, and sentenced to serve forty-eight years in prison without the possibility of parole.

### B.    Post-Conviction Evidence

The state appellate court summarized the evidence presented at the post-conviction hearing as follows:

The Petitioner filed a petition for post-conviction relief and amended petitions claiming that he received the ineffective assistance of counsel at trial and that the trial court sentenced him in violation of his constitutional right to a jury. The post-conviction court held an evidentiary hearing where the following evidence was introduced:

Byron Grissom, Director of Records Management for the Davidson County Sheriff's Office, testified that records documenting the Petitioner's visitors while incarcerated indicated that the Petitioner's trial counsel ("Counsel") visited with the Petitioner on August 6, 2002, for one hour; on April 20, 2003, for forty-five minutes; and on April 27, 2003, for forty-five minutes. Grissom agreed that the records would not reflect any meetings that may have occurred outside the jail, such as those occurring at court facilities. Grissom clarified that the Petitioner had been released from jail at one point and then returned. Any meetings with Counsel during the time of release would not have been recorded.

Jodie Bell testified that she was appointed to represent the Petitioner on appeal in November 2003. Bell recalled she represented the Petitioner during his direct appeal, and she raised a sentencing issue based on *Blakely v. Washington*, 542 U.S. 296 (2004), a recently published case at the time. Based on *Blakely*, she appealed the length of the Petitioner's sentence but not the trial court's imposition of consecutive sentencing. She explained that, at the time she filed the petition, she did not feel there was a legal basis for raising Blakely as authority for challenging consecutive sentencing.

Jerry Davidson, the victim's grandfather, testified that no police officer or attorney interviewed him for the case against the Petitioner. Mr. Davidson stated that he lived with the Petitioner, his daughter, and the victim for two or three years prior to the Petitioner's arrest in this case. Mr. Davidson testified that he never saw the Petitioner sexually abuse

or mistreat the victim, although he did witness the Petitioner argue with the victim. Mr. Davidson testified that he did not attend any of the legal proceedings in connection with this case and that he did not feel that he had any important information to provide in this case. Mr. Davidson said that he was a truck driver, a position that frequently required him to travel out of town, and he estimated that he was away from the home approximately thirty or forty percent of the time. Mr. Davidson also acknowledged that he was aware of instances of domestic violence between the Petitioner and his daughter.

Loretta Roberts, the Petitioner's sister, testified that, initially, a public defender represented her brother on these charges until the family made the decision to hire private counsel. Roberts explained that, because she had no experience with attorneys, she selected an attorney that the family could afford from the Yellow Pages. Roberts said she initially met with Counsel, paid him, and then never spoke with him again, although she thought her husband talked to him once after leaving several messages for Counsel. Roberts recalled that the Petitioner requested she try to contact Counsel because the Petitioner could not place a collect call to Counsel's office from the jail and because Counsel did not respond to letters the Petitioner had written to Counsel. Roberts said that she did not testify at the sentencing hearing because she was not asked to testify and that Counsel did not interview any of the family members as possible witnesses in this case. Roberts acknowledged that the Petitioner and the victim did not "get along," but she was unaware of any sexual abuse.

On cross-examination, Roberts testified that the Petitioner loved children and that she had never seen the Petitioner mistreat any child. Roberts was aware domestic violence had occurred between the Petitioner and the victim's mother and that the victim may have witnessed this violence.

Tracey Davidson, the victim's mother, testified that when the victim was approximately two or two-and-a-half, the victim had a nightmare and was crying hysterically. Ms. Davidson's mother said, "[S]omebody has done something to this baby, something is wrong with her." They were able to calm the victim, and the victim went back to sleep. While Ms. Davidson was at work the following day the victim told Ms. Davidson's mother that her paternal grandmother "had hurt her bottom or touched her bottom." Ms. Davidson took the victim to the doctor and was told there was no indication of sexual abuse.

Ms. Davidson testified that at age five or six the victim began taking medication for bipolar disorder. Ms. Davidson described the victim's behavior that led to the diagnosis as "temper tantrums that were real scary." Ms. Davidson agreed that, on different occasions, the Petitioner fought with both herself and the victim. On several occasions the Petitioner became physically abusive with Ms. Davidson, and the victim was present on at least one of these occasions.

Ms. Davidson stated that Counsel never interviewed her.

Counsel testified that he had handled two or three child sex abuse cases at the time the Petitioner's family retained him. Counsel reviewed his file in the hearing and agreed that there were two letters of correspondence from him to the Petitioner, but Counsel was not certain whether there might be more correspondence on his computer that was not in the file. Counsel testified that he interviewed the victim but that he did not find any notes in his file related to the interview. Counsel testified that his defense strategy was to attack the credibility of the State's witnesses. Counsel recalled that the weekend before trial he provided the Petitioner with a list of approximately thirty questions that Counsel might ask in the event the Petitioner chose to testify at trial. Counsel said that, before trial he understood that the Petitioner wanted to testify but that, at the close of the State's proof, he advised the Petitioner not to testify. Counsel stated, "He knew he had every

right to do so, but he chose to take my advice." Counsel said that he believed the Petitioner would have made a poor witness.

Counsel agreed that a letter he sent to the Petitioner summarizing plea negotiations addressed the Petitioner as "Richard" rather than his correct name. Counsel denied any knowledge that the Petitioner complained about communication with Counsel and stated, "I feel like I talked to [the Petitioner] about this case as much as we could have talked about it."

Counsel was asked about the fact that the victim's grandmother had suggested that the victim said that a schoolmate grabbed her "in her private area." Counsel agreed that he did not interview the grandmother regarding this allegation but said he looked into whether there were any Department of Children's Services ("DCS") investigations surrounding the complaint and found none. Counsel also acknowledged that he never interviewed Mr. Davidson, the victim's grandfather, explaining that he did not do so based on information he had from other family members, discovery, and the Petitioner. In Counsel's opinion, Mr. Davidson did not have anything to add that would have been helpful to the Petitioner's case.

On cross-examination, Counsel testified that neither his interview with the victim nor the materials he received in discovery indicated the victim was incompetent to testify. Counsel said that he filed a motion in limine to exclude testimony from mental health professionals that would have corroborated the fact that the victim suffered some type of traumatic injury due to sexual abuse. Counsel said his file also contained notes on various legal issues and case law he researched in connection with the Petitioner's case.

Counsel testified that, in discussions with the Petitioner about whether he would testify, Counsel explained the implications of the admission of additional evidence, including evidence of the domestic violence or pornography being displayed to the victim. Counsel recalled that the substance of Petitioner's testimony would have been a denial. Counsel testified that there was not any credible evidence to support a motive for the victim to falsely accuse the Petitioner. Counsel recalled that the Petitioner told a detective in this case that he and the victim got along well and he knew of no reason why the victim would falsely accuse him. Counsel stated that he could not "think of a defense that I could have put on for [the Petitioner] any different than what we did."

The Petitioner testified that he had a ninth grade education and that his only criminal record was an assault charge for which he was not convicted. The Petitioner testified that he met Ms. Davidson in 1995, and, in 2000, he moved into a trailer with Ms. Davidson, her father, and the victim. The Petitioner was aware that the victim had been to see psychiatrists. The Petitioner denied he sexually abused the victim but acknowledged that he had committed acts of domestic violence against Ms. Davidson and that the victim had witnessed these acts.

The Petitioner said he and Ms. Davidson have a son together, and the Petitioner believed that the victim was jealous of this child. The Petitioner recalled that the victim lived part of the time with her grandmother but stayed at the trailer two or three weekends a month. The Petitioner testified that most of the time he was around the victim Ms. Davidson was present. The Petitioner acknowledged that he watched the Playboy channel and that the victim could have been in the room while he was watching, but he said he did not purposefully sit her down to watch it.

About the Petitioner's meetings with Counsel, he stated that he was never released on bond during his incarceration for these charges. The Petitioner recalled meeting with Counsel in the holding cells at the courthouse in addition to the times Counsel met with him at the jail and the conversations at both locations were about the State's settlement

offers, not the case.  The Petitioner recalled that, after he refused the State's offer the night before trial, Counsel said that they needed to figure out a defense and that they concluded that the defense strategy would be that the Petitioner "didn't do it" because that was "the only defense at the time."

The Petitioner denied ever receiving a list of questions from Counsel that Counsel would have asked the Petitioner if he had testified at trial.  The Petitioner also denied ever knowing that Counsel interviewed the victim.  The Petitioner said he wanted to discuss a defense with Counsel, but Counsel did not respond to the Petitioner's letters.  The Petitioner said that he wanted to testify at trial and tell the jury he did not sexually abuse the victim but that he chose not to testify because Counsel had not prepared him to testify.

On cross-examination, the Petitioner acknowledged that he did not propose a defense to either the public defender who initially represented him or Counsel, other than maintaining his innocence.  The Petitioner also agreed that Counsel argued at trial that the Petitioner did not sexually assault the victim.  The Petitioner stated that he did not know of any other evidence that could have been presented to substantiate his defense.  The Petitioner agreed that essentially his testimony would have been a denial of the abuse and that all contrary testimony presented at trial was a lie.

At the conclusion of the hearing, the post-conviction court took the petition under advisement and later issued an order denying post-conviction relief.

*Brown v. State*, 2010 WL 2516857, at *4–*8.

## III. DISCUSSION

Of the thirteen claims identified by the Court, nearly all of them concern federal constitutional issues that were fairly presented to the Tennessee state courts for consideration as required by 28 U.S.C. § 2254(b)(1)(A), and as such are properly before this Court for review under § 2254(d).  A few of them, as identified below, either were never presented at all in state court, or were presented under a different theory than that presented to the state court.  As set forth herein, the Court finds that none of the claims provides a valid basis for habeas relief.

### A.      Standard of Review of Fully Exhausted Federal Claims

Even when a petitioner's application for a writ of habeas corpus raises a federal constitutional claim that has been properly exhausted in the state courts, this Court's review of the state court's resolution of the issue is quite limited.  The standard for reviewing applications for the writ of habeas corpus is set forth in 28 U.S.C. § 2254(d).  This section states:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of

the United States; or

   (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.*  Additionally, this Court must presume the correctness of state court factual determinations, and the petitioner has the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Cremeans v. Chapleau*, 62 F.3d 167, 169 (6th Cir. 1995) ("We give complete deference to state court findings unless they are clearly erroneous."), *abrogated on other grounds by Thompson v. Keohane*, 516 U.S. 99, 111 (1995).

  **B.**  **Standard of Review of Defaulted Claims**

  Generally, a federal district court will not entertain a petition for writ of habeas corpus unless the petitioner has first exhausted all available state-court remedies for each claim in his petition.  28 U.S.C. § 2254(b)(1).  While exhaustion is not a jurisdictional requirement, it is a strictly enforced doctrine which promotes comity between the states and the federal government by giving the state an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  Consequently, as a condition precedent to seeking federal habeas corpus relief, the petitioner is required to fairly present his claims to every available level of the state court system. *Rose v. Lundy*, 455 U.S. 509, 518–20 (1982); *see also Duncan v. Henry*, 513 U.S. 364, 365–66 (1995) ("[A] federal habeas petitioner . . . [must] provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim.").  Moreover, "the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court."  *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998).  Once a petitioner's federal claims have been raised in the highest state court available, the exhaustion requirement is satisfied, even if that court refused to consider the claims.  *Manning v. Alexander*, 912 F.2d 878, 883 (6th Cir. 1990).[4]

  A habeas petitioner bears the burden of demonstrating that he has properly and fully exhausted his available state court remedies with respect to the claims he presents for federal habeas review.

---

[4] In Tennessee, review by the state Supreme Court is not required for exhaustion.  Instead, "once the Court of Criminal Appeals has denied a claim of error, 'the litigant shall be deemed to have exhausted all available state remedies available for that claim.'"  *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. S. Ct. R. 39).

*Prather v. Rees*, 822 F.2d 1418, 1420 n.3 (6th Cir. 1987) (citation omitted). If a habeas petitioner retains the right under state law to raise a claim by any available procedure, he has not exhausted that claim. 28 U.S.C. § 2254(c). Ordinarily, habeas petitions containing unexhausted claims are dismissed without prejudice in order to permit the petitioner the opportunity to pursue them in state court. *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) (citing *Rose*, 455 U.S. at 518, 520–22); *see also Rhines v. Weber*, 544 U.S. 269 (2005) (reconfirming the continued relevance of *Rose* under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")). However, if an unexhausted claim would be procedurally barred under state law, for instance by statutes of limitations or state rules barring successive petitions, then the claim is deemed exhausted (because no further state review is available) but procedurally defaulted, and may not be considered by the federal court on habeas review except under extraordinary circumstances. *Alley v. Bell*, 307 F.3d 380, 385–86 (6th Cir. 2002) (citations omitted); *In re Cook*, 215 F.3d 606, 607–08 (6th Cir. 2000). In order to obtain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate both cause for the procedural default and actual prejudice resulting from the alleged constitutional errors, or alternatively that failure to consider the claims will result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *cf. Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

With these principles in mind, the Court will proceed to consider Brown's claims.

**C. Analysis of Claims**

***Claim 1: Whether the Evidence Was Sufficient to Support the Convictions***

The petitioner asserts that the evidence was insufficient to support his convictions, and thus that his convictions were in violation of his constitutional rights under the Sixth and Fourteenth Amendments, because (a) the testimony of the alleged victim was not credible; (b) there was no physical evidence to support the rape convictions; and (c) the State failed to prove an essential element of the charge of aggravated sexual battery. The respondent concedes that this claim was raised and fully exhausted in the state court on direct appeal, but argues that the state appellate court's resolution of the issue was not contrary to or an unreasonable application of clearly established federal law.

The Tennessee Court of Criminal Appeals in fact relied on the appropriate legal standard, as articulated by the Supreme Court, when it stated that the relevant question for the reviewing court

confronted with a challenge to the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Brown*, 2005 WL 1412088, at *4 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In dispensing with the petitioner's claim that the victim's[5] testimony was "confused" and "unclear" and therefore not credible, the court observed, based on state law, that questions involving the credibility of witnesses are entrusted exclusively to the jury as the trier of fact. The court also accurately paraphrased the testimony of the child victim, who testified at trial regarding the instances of sexual abuse that she recalled. Although her testimony was at times confused and garbled as to place and time, it was not so confusing that it was irreconcilable with the truth. In considering her testimony, the appellate court was required to view the evidence in the light most favorable to the State, and to draw all reasonable inferences in favor of the State. The decision to uphold the rape convictions was not contrary to or based on an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. The evidence presented by the State was clearly sufficient to permit the jury to return a guilty verdict on all five charges.

As for the lack of physical evidence of penetration, the court referenced the state-law definition of rape of a child as "the unlawful sexual penetration of a victim or the defendant by a victim, if such victim is less than thirteen (13) years of age," Tenn. Code Ann. § 39-13-522(a), and the definition of "sexual penetration" as including "any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's . . . body." Tenn. Code Ann. § 39-13-501(7). The child victim recounted at least two separate incidents during which the defendant put his finger or fingers "in her" and demonstrated what she meant using anatomically correct dolls. She also distinguished between times when the defendant put his fingers inside her and when he simply touched her on the outside.

Pediatric nurse practitioner Sue Ross, who was qualified by the trial court as an expert competent to offer opinion testimony in the areas of pediatric nursing and sexual assault examinations, testified that

---

[5] The petitioner refers to the child victim as the "alleged" victim in his filings. Because the fact of his guilt has been established at trial, and this Court finds no basis for setting aside either his conviction or sentence, the Court will refer to her as the "victim" rather than as the "alleged victim."

she conducted a physical examination of the child victim on May 15, 2001. According to Ms. Ross, the child's physical examination was completely normal and showed no evidence of trauma or sexual abuse. Ms. Ross also testified, however, that the physical examination was consistent with the child's reported history of abuse, because only a very small percentage of children who report sexual abuse in the form of digital-genital contact exhibit any physical sign of abuse, such as a torn hymen. (Trial Transcript at 140:5–141:3.) The child victim's testimony was sufficient to establish that sexual "penetration" occurred, as that term is defined by state law, and Ms. Ross's testimony, which the jury clearly credited, was sufficient to establish that the absence of physical findings was not dispositive and did not in any way refute the child's testimony. The state court did not err in concluding that the evidence was sufficient to permit a rational trier of fact to find the essential element of "penetration" beyond a reasonable doubt.

Mr. Brown's third challenge to the sufficiency of the evidence raises the question of whether the evidence was sufficient to prove aggravated sexual battery. Under state law, to prove that charge, the State was required to prove unlawful sexual contact with the victim by the defendant, defined to include "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification," Tenn. Code Ann. § 39-13-501(6), accompanied by any of the circumstances enumerated in Tenn. Code Ann. § 39-13-504(a), including that the victim was less than thirteen years of age. The only element of the charge the petitioner disputes is the *mens rea* required for unlawful touching—that is, he denies that the State offered any proof to establish that his purported touching of the victim was for the purpose of sexual arousal or gratification.

In disposing of that argument on direct appeal, the Tennessee Court of Criminal Appeals stated:

Taken in the light most favorable to the State, a reasonable jury could conclude that the defendant touched the victim's genitals on at least two separate occasions and had her touch his penis at least once in the bathroom. Some of the sexual contact was contemporaneous with the showing of "sexually explicit" programming to the victim, and the defendant asked the victim not to tell anyone. The touching took place usually when other family members were in other parts of the house or away from the house on errands. Thus, the jury could reasonably conclude that the defendant intentionally touched the victim's vagina, and had her touch his penis, for the purpose of sexual arousal or gratification. Finally, we note that the statute only requires an intentional touching that can be "reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6) (emphasis added). Thus, we conclude that the evidence was sufficient for a rational trier of fact to find the defendant guilty

beyond a reasonable doubt of aggravated sexual battery.

*State v. Brown*, 2005 WL 1412088, at *6 (most internal citations omitted). The decision to uphold the convictions for aggravated sexual battery was primarily based on the court's interpretation and application of state law, and therefore did not involve an unreasonable application of clearly established federal law. More to the point, it was not based on an unreasonable determination of the facts in light of the evidence presented.

The petitioner's first claim does not entitle him to habeas relief.

### Claim 2: Whether the Prison Term Is Excessive because the Court Improperly Found Enhancement Factors

Under Tennessee's statutory sentencing scheme, the petitioner's child-rape convictions carried a range of 15 to 25 years, with a presumption that 20 years (the middle of the range) was the appropriate sentence in the absence of the finding of enhancement factors, and his aggravated sexual battery counts carried a range of 8-12 years with a presumption that 8 years (the low end of the range) was appropriate, again in the absence of the court's finding any enhancement factors.

At the initial sentencing, the trial court found that there were no mitigating factors but that four of the State's proposed enhancing factors applied to the rape counts and that three factors applied to the sexual battery counts. The court therefore sentenced the petitioner to the upper end of the range on the rape charges (25 years) and the middle of the applicable range for the battery convictions (10 years), instead of the middle and lower ends of the ranges, respectively. On direct appeal, Brown argued that the trial court abused its discretion in imposing a sixty-year sentence, and specifically that it erred in its finding and application of enhancement factors. The Tennessee Court of Criminal Appeals rejected this argument and affirmed the original 60-year sentence, relying on *State v. Gomez*, 163 S.W.3d 632 (Tenn. 2005) ("*Gomez I*"), which held that the United States Supreme Court's decision in *Blakely v. Washington*, 524 U.S. 296 (2004), did not preclude the trial court from considering statutory enhancement factors relative to the petitioner's sentence.

After a lengthy post-conviction briefing period, however, the trial court found that the petitioner was entitled to a new sentencing hearing and reduction of his sentence based on *Gomez v. Tennessee*, 549 U.S. 1190 (2007), which vacated *Gomez I* and remanded for further consideration in light of *Cunningham v. California*, 549 U.S. 270 (2007), also issued while the petitioner's post-conviction

proceedings were still pending. In *Cunningham*, the Supreme Court held that that California's determinate sentencing law, which authorized the judge rather than a jury to find facts exposing the defendant to the upper end of a sentencing range, violated the defendant's right to trial by jury. On the remand of *Gomez*, the Tennessee Supreme Court held that the trial court's application of enhancement factors in sentencing, under a statutory scheme similar to California's, violated the defendant's Sixth Amendment right to a jury trial. *State v. Gomez*, 239 S.W.3d 733 (Tenn. 2007) ("*Gomez II*").

In light of *Cunningham* and *Gomez II*, both of which were issued while the parties were still briefing post-conviction issues to the trial court, the court found that the petitioner was entitled to a new sentencing hearing. On resentencing, the trial court reduced the sentences in accordance with the statutory presumptions, in which no enhancements applied, or 20 years for each rape charge and 8 years for the aggravated sexual battery charges. The court again specified that the rape charges would run consecutively, and that the aggravated sexual battery charges would run concurrently with each other but consecutively to the rape charges, for an effective sentence of 48 years. Although the petitioner challenged the decision to make the prison terms consecutive, as discussed below, he did not appeal the sentencing ranges applied on the individual charges.

He nonetheless raises that issue again here, asserting that his sentence is excessive because the court "improperly applied enhancement factors rather than the jury." (ECF No. 1, at 6.) Because he did not raise this claim before the Tennessee Court of Criminal Appeals during post-conviction proceedings, it has not been fully and fairly presented to the state courts for consideration in the first instance. Federal habeas review of this issue is therefore barred by procedural default. *Coleman v. Thompson*, 501 U.S. 722, 752–53 (1991). Regardless, while the trial judge did originally apply enhancement factors, the record establishes that the judge later reversed that decision during the post-conviction proceedings and reduced Mr. Brown's total sentence by 12 years. There is no indication in the record that the petitioner's current sentence is the result of judge-found enhancements. This claim is therefore without merit.

### Claim 3: Whether the Prison Term Is Excessive because the Court Improperly Imposed Consecutive Sentences

The petitioner also argues that the trial court's imposition of consecutive rather than concurrent sentences violated his right to a jury trial under the Fifth, Sixth and Fourteenth Amendments to the United

States Constitution. The respondent concedes that this claim was fully and fairly presented in the state courts on direct appeal and during post-conviction proceedings.

In his post-conviction brief to the Tennessee Court of Criminal Appeals, the petitioner conceded that both the United States Supreme Court and the Tennessee Supreme Court had held that the Sixth Amendment does not require that facts necessary for the imposition of consecutive sentences be determined by a jury. (ECF No. 35-8, at 76 (citing *Oregon v. Ice*, 555 U.S. 160 (2009); *State v. Allen*, 259 S.W.3d 671, 689–90 (Tenn. 2008)).) In *Ice*, the Supreme Court was presented with a factually similar case involving four charges of sexual assault on a minor child along with two charges of first-degree burglary. The trial court ordered that most of the sentences on the charges run consecutively and imposed a total sentence of 340 months' imprisonment. On review, the Supreme Court affirmed, expressly declining to extend the holdings of *Cunningham* and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), to this setting, and holding instead that a state statute assigning to judges the decision of whether sentences should run concurrently or consecutively did not violate the Sixth Amendment. *Ice*, 555 U.S. at 172.

This issue was fully and fairly litigated in the state proceedings, and presents a federal constitutional claim. However, it is also clear that the state court's application of the recently decided *Oregon v. Ice* to determine that the petitioner's claim for relief was without merit did not involve an unreasonable application of clearly established federal law. Habeas relief on this ground is not warranted.

### Claim 4: Whether Erroneous Jury Instructions Violated the Petitioner's Right to a Jury Trial and to Due Process

Brown contends that the trial court erred in its definition of the elements of the crime of rape of a child in the instructions provided to the jury. Specifically, the trial court charged the jury that the crime of rape of a child could be committed "intentionally, knowingly, or *recklessly*." (ECF No. 1, at 23.) Brown objects to the trial court's description of the *mens rea* for child rape to include reckless conduct, asserting that there is no such thing as a "recklessly" committed rape. The petitioner also objects to the disjunctive use of "or" in the same phrase. That is, he insists that the offense had to be committed intentionally *and* knowingly, rather than intentionally *or* knowingly.

The petitioner raised both these facets of his erroneous-jury-instructions claim in the state courts

during post-conviction proceedings. The Tennessee Court of Criminal Appeals conducted a *de novo* review of the claim but rejected it. In doing so, the court first noted that a trial court has a duty, in criminal cases, to fully instruct the jury on the general principles of law relevant to the issues raised by the evidence, and that "[n]othing short of a clear and distinct exposition of the law satisfies a defendant's constitutional right to a trial by jury." 2010 WL 2516857, at *13 (internal quotation marks and citations omitted). The court went on to conclude, however, that the instructions provided by the trial court fully comported with Tennessee state law. *Id.* at *14–*15.

In other words, although Brown's objection to the jury instructions as erroneous raises a federal constitutional issue, the Tennessee Court of Criminal Appeals, while fully acknowledging the constitutional import of the issue, disposed of it on purely state-law grounds. Generally speaking, a state court's interpretation of state law is binding on a federal court reviewing a habeas petition. *Bradshaw v. Rickey*, 546 U.S. 74, 76 (2005). Moreover, because jury instructions are typically matters of state law, the standard for demonstrating that an erroneous jury instruction caused constitutional error in a habeas proceeding "is even greater than the showing required to establish plain error on direct appeal." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). A habeas petitioner must show that the challenged jury instruction "so infused the trial with unfairness as to deny due process of law." *Estelle v. McGuire*, 502 U.S. 62, 75 (1991). If a petitioner fails to meet this burden, he fails to show that the jury instructions were contrary to federal law. *Id.*

The petitioner here has not shown that the jury instruction to which he objects was contrary to state law, or that the instruction infused the trial with any degree of unfairness. This claim too is without merit.

### Claims 5 through 13: Whether the Petitioner Was Denied the Effective Assistance of Counsel in Violation of the Sixth and Fourteenth Amendments to the United States Constitution

The operative federal standard pertaining to ineffective-assistance claims is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which states that a defendant cannot prevail on an ineffective-assistance claim unless he shows that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. To prove this element, the defendant must first demonstrate that counsel's representation fell below an objective

standard of reasonableness. *Id.* at 688. In judging an attorney's conduct, a habeas court are to beware of the "distorting effects of hindsight," and to "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 689–90. Additionally, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Second, the defendant must prove that his defense was prejudiced by his counsel's unprofessional errors; that is, that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.* "Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

Although the record, as indicated below, suggests that the petitioner's trial attorney did not do all he could have done in the representation of his client's interests, this Court cannot conclude under the above-referenced standard that counsel's conduct was constitutionally deficient, or that the state court's rejection of the petitioner's ineffective-assistance claims involved an unreasonable determination of the facts in light of the evidence presented the state court proceedings, or that it was contrary to or involved an unreasonable application of the standard established by *Strickland.* 28 U.S.C. § 2254(d).

### Claim 5: Failure to conduct a reasonable investigation into the law and facts of the case, and specifically for failing to interview important defense witnesses and prepare defense witnesses for trial

Mr. Brown asserts here that his trial counsel did not conduct any reasonable investigation into the facts and law to determine what defense could be developed, and, more specifically, that he failed to interview potentially important defense witnesses including Jerry Davidson, Brown's father-in-law who lived in the trailer in which several instances of abuse allegedly occurred; Tracey Davidson, the victim's mother; Loretta and Lisa Roberts, the petitioner's sisters; and the petitioner's nieces and nephews. The petitioner raised this claim in his state post-conviction proceedings; the trial court rejected the claim on the basis that trial counsel had made a strategic decision not to call these witnesses, or, in the case of Tracey Davidson, not to seek to introduce potential evidence that her daughter might have been subject to some form of sexual abuse at age 2 or 3. The trial court also concluded that the testimony these

witnesses could have offered at trial, if they had been properly interviewed by defense counsel, would not have affected the outcome of the case. The Tennessee Court of Criminal Appeals affirmed.

This Court has reviewed the record and finds that, while it certainly would have been prudent and even advisable to interview these witnesses prior to trial, counsel's failure to do so did not fall so far below the acceptable standard of conduct as to establish that he was not functioning as "counsel" in the constitutional sense. Nor has the petitioner shown that, but for counsel's errors, the result of the proceeding, either at trial or sentencing, would have been different.

### Claim 6: Failure to prepare petitioner to testify and advising him not to testify

Mr. Brown asserts that his trial counsel only met with him three times prior to trial, and never at any time discussed with him trial strategy or the development of a defense. Mr. Brown complains that his trial attorney "would not let [him] testify, even though he wanted to testify." (ECF No. 1, at 11.) Mr. Brown admits, however, that he "agreed" not to testify, but claims he made that decision only because of his limited education and limited understanding of the trial procedure, and because his attorney had not adequately prepared him to testify effectively on his own behalf. Mr. Brown further asserts he would have been able to testify without fear of impeachment because he had no criminal record and had never confessed to the crimes he was accused of committing. In addition, if he had testified, then character witnesses could also have testified on his behalf, including his sisters and teen-aged nieces and nephews. The petitioner raised this claim in state court; it was rejected by both the initial post-conviction court and on appeal.

The petitioner testified at the post-conviction hearing that he wanted to testify at trial, and that he would have informed the jury that he did not commit the offenses with which he was charged. As the trial court stated, Mr. Brown did not complain that his counsel actually prevented him from testifying; rather he asserts (now and in the courts below) that his counsel was ineffective because he recommended to the petitioner that he not testify and did not prepare him to testify. Trial counsel testified that he discussed with Brown the pros and cons of his testifying on his own behalf, and explained what additional evidence might come in if the petitioner testified, including evidence of prior instances of domestic violence. Counsel testified that, because the only evidence the petitioner could offer was a general denial of the claims, he believed that the petitioner's testifying on his own behalf would cause more harm than good.

The trial court found Brown's counsel's testimony to be credible and further noted that the court had conducted a hearing pursuant to *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999), during which the petitioner was advised of his right to testify and elected in open court and in writing to waive that right. The trial court found that trial counsel had performed his role appropriately by advising the defendant as to whether to testify, and that the petitioner had not established either that counsel actually prohibited him from testifying or that he was prejudiced by any alleged deficiency. The Court of Appeals affirmed on the basis that the evidence in the record did not preponderate against the post-conviction court's finding.

Reasonable minds could certainly differ as to whether Brown's counsel was correct in advising his client not to testify. Regardless, this Court finds that the state court applied the appropriate legal standard, that established in *Strickland v. Washington*, 466 U.S. 668 (1984), for review of a claim of ineffective assistance of counsel, and that the court's application of federal law was not "objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (internal quotes omitted), nor did it involve an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

### Claim 7: Failure to present any defense proof at trial

Mr. Brown asserts in his habeas petition that his trial counsel failed to prepare or present any witnesses on behalf of Mr. Brown, even though the prosecution's entire case depended on the credibility of the victim, which Mr. Brown could not contest since he did not testify, and was thus not able to put on character witnesses from his own family. He asserts that his counsel's failure in this regard constitutes ineffective assistance of counsel. He raised this claim in his state post-conviction proceedings; the Tennessee Court of Criminal Appeals rejected it, noting that, in response to the petitioner's claim, his trial counsel had testified that his defense strategy was to attack the credibility of the State's witnesses and to assert that the State had not met its burden of proof. The petitioner himself stated that the only additional proof he thought should have been offered was his own testimony refuting the claims. The post-conviction court determined that Mr. Brown had not established either that his counsel's tactical decision, such as it was, fell below the applicable standard or that, but for counsel's errors, the result of the proceeding would have been different. The appellate court affirmed. That court applied the appropriate legal standard as established in *Strickland*, and its application of federal law was not "objectively

unreasonable." *Williams*, 529 U.S.at 409.

### Claim 8: Failure to investigate the victim's mental health history or to subpoena psychiatric records

In his present petition, Mr. Brown asserts that his trial counsel could and should have issued subpoenas for psychiatric records that would have demonstrated that the child victim had a history of suffering from bi-polar disorder as well as "problems with honesty and truthfulness." The petitioner raised this claim in his state post-conviction proceedings, based upon which the post-conviction court subpoenaed copies of the victim's records. The court reviewed the records and concluded that there were a few pages in the medical records from 1999 to 2002 that the court "may have provided trial counsel had the records been requested at that time," but that the records in question were not necessarily exculpatory. Trial counsel testified that he interviewed witness and reviewed discovery, and did not come across proof that the victim was not competent to testify. In addition, he filed a motion *in limine* seeking to prevent testimony from mental health practitioners who would have corroborated the claim that the victim was suffering from symptoms related to the sexual abuse.

This Court finds that the petitioner has not established either that his counsel's tactical decision, such as it was, fell below the applicable standard or that the petitioner was prejudiced by his counsel's failures. And it is clear that the state court applied the appropriate legal standard as established in *Strickland*, and the court's application of federal law was not "objectively unreasonable." *Williams*, 529 U.S.at 409.

### Claim 9: Failure to investigate and object to the jury instructions defining the mens rea *for rape of a child*

Mr. Brown asserts that his counsel was ineffective for failing to object to the jury instructions defining the necessary elements of the crime of rape of a child, in particular the *mens rea* required for commission of the offense. He asserts that rape of a child cannot be committed "recklessly" and that it must be committed "intentionally and knowingly," rather than "intentionally *or* knowingly." As set forth above, the Tennessee Court of Criminal Appeals determined that the referenced instructions correctly stated Tennessee law. Counsel could not have been ineffective based on his failure to object to an instruction that was itself not legally deficient.

### Claim 10: Failure to recognize and object to discrepancies between the Bill of Particulars and the State's final election of offenses

In his state post-conviction proceedings, the petitioner argued that his counsel was ineffective for failing to cross examine the State's witnesses concerning the discrepancies between the Bill of Particulars and the State's final election of offenses. The Court of Criminal Appeals noted that the only real discrepancy between the two was that the election of offenses indicated in count two that the incidence of abuse took place in the victim's maternal grandmother's house rather than in the petitioner's residence. The court further noted that the Bill of Particulars and the election of offenses are not evidence or statements made by a party or witness and thus the discrepancy could not have been used for impeachment purposes, and therefore held that the petitioner failed to show that his counsel's failure to cross-examine the State's witnesses about the discrepancy amounted to deficient performance or that he was prejudiced by the alleged failure.

In his habeas petition, Brown contends that his trial counsel was ineffective both for failing to make a timely objection based on the discrepancies between the initial charging documents and the election of offenses, and for failing to preserve the issue for appeal. Brown further asserts that his attorney's failure seriously prejudiced his defense. The respondent asserts that the claim as presented here is based on a different theory than that presented in the state post-conviction proceedings and that it is therefore procedurally defaulted for purposes of habeas review. *Landrum v. Mitchell*, 625 F.3d 905, 918–19 (6th Cir. 2010).

Even assuming the theory is the same as that presented to the state courts, it does not appear that the state court's resolution of the issue was constitutionally deficient. Nor has Brown shown that he was prejudiced by the failure explicitly to point out the discrepancies between the charging documents and the election of offenses. During his cross-examination of the victim, he made some attempt to question her about the differences between her testimony and what she had previously reported to other people. He likely could have done a better job to bring out the inconsistencies and confusion in her account. Realistically, however, the jury was likely to credit the child's testimony despite her lack of specificity, and any attempt to conduct an aggressive cross-examination of the young child could easily have been more detrimental than helpful to the defense. Brown therefore cannot show that he was prejudiced by this alleged failure.

### *Claims 11–13:  Procedurally defaulted ineffective-assistance claims*

Brown asserts several ineffective-assistance claims that he did not raise in the state post-conviction proceedings.  Specifically, he alleges his trial counsel was ineffective for (1) failing to impeach witness Phyllis Thompson regarding the technique she employed during her initial interview of the complaining witness; (2) failing effectively to cross-examine nurse practitioner Sue Ross regarding her physical examination of the complaining witness; and (3) failing effectively to cross-examine Tracey Davidson.  Having failed to raise these claims in the state court, the petitioner is barred by the post-conviction statute of limitations and restrictions on successive state petitions from presenting these claims to the state court now.  Tenn. Code Ann. §§ 40-30-102(a), -102(c), and -117.  Because petitioner has never fully and fairly presented these claims to the state courts, and a state procedural rule prohibits the state court from extending further consideration to them, the claims are deemed exhausted but procedurally precluded from federal habeas review unless the petitioner can demonstrate cause and actual prejudice to overcome the default, or a miscarriage of justice (*i.e.*, a colorable claim of factual innocence in light of federal constitutional error).  *Coleman v. Thompson*, 501 U.S. at 752–53.  Brown has not alleged any cognizable cause for his default, let alone made a showing of prejudice.

The standard for showing a "fundamental miscarriage of justice" is higher than the standard for showing cause and prejudice.  A "fundamental miscarriage of justice" is deemed to occur when "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496.  The petitioner does have an implicit miscarriage-of-justice claim:  He essentially maintains that he is innocent.  He has not, however, presented any previously unavailable evidence in support of that position, and consideration of the defaulted claims would not serve to avoid a miscarriage of justice or to establish his innocence. Thus, review of these claims is barred by procedural default.

### *Conclusion:  Ineffective assistance of counsel*

The record suggests that the petitioner's trial counsel, Matthew Mayo, was somewhat inexperienced in trying sexual-abuse cases and that he devoted relatively little time and effort to the preparation of Brown's case for trial.  Notwithstanding, Brown has not overcome the "strong presumption" that his counsel's conduct fell "within the wide range of reasonable professional assistance" or that his attorney "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the

defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687, 689 (1984). He also has not shown that it is reasonably probable that, but for counsel's errors, the result of the proceeding would have been different. *Id.* And more importantly for this Court's purposes, Brown has not established that the state court's resolution of the same questions involved an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding.

## IV. CONCLUSION

For the reasons set forth herein, the Court finds that Brown's petition is without merit. His claim for relief will therefore be denied, and this matter dismissed.

The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, Rules Gov'g § 2254 Cases. The petitioner may not take an appeal unless a district or circuit judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the COA must "indicate which specific issue or issues satisfy the [required] showing . . . ." 28 U.S.C. § 2253(c)(3). A "substantial showing" is made when the petitioner demonstrates that "'reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further."'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "[A] COA does not require a showing that the appeal will succeed." *Miller-El*, 537 U.S. at 337. Courts should not issue a COA as a matter of course. *Id.*

In this case, although reasonable jurists could debate whether Brown's trial counsel was deficient, the petitioner has not "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). The Court will therefore deny a COA as to the petitioner's claims.

An appropriate order will enter.

Kevin H. Sharp
United States District Judge